UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SHAAREI ARAZIM OF MONSEY and,
STONE BIOMED CORP.,

                                          Civil Action No.10-cv-7099(VLB)

                          Plaintiffs,

          -against-

MICHAEL HOROWITZ and ALONA HOROWITZ,

                                  Defendants.
------------------------------------------------------------X


**PLAINTIFFS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**


SAVAD | CHURGIN
Attorneys for Plaintiffs
55 Old Turnpike Road Ste.209
Nanuet, NY 10954
(845) 624-3820

TABLE OF CONTENTS                                                   PAGE

I.     INTRODUCTION……………………………………………………… 1

II.    PROPOSED FINDINGS OF FACT  ……………………………………2

       A. Background…………………………………………………………2

       B. Shaarei makes plans to purchase property…………………………………3

       C. 12/03-Biomed purchases 52 S. Main, & Shaarei begins fundraising……………4

       D. Horowitz' promises………………………………………………………5

       E. 5/04-Purchase of 56 S. Main……………………………………….......6

       F. 1/05-Purchase of 1 E. Funston…………………………………………...8

       G. Horowitz confirms to Bernstein the promise to donate the properties…………..9

       H. 2/1/06-Horowitz purchases 52 S. Main……………………………………11

       I. Moskovitz resigns as executive director…………………………………...12

       J. Horowitz demands that Shaarei sign leases in 2008……………………………12

       K. Horowitz first disavows his promise to donate the properties…………………..13

       L. Horowitz' claim that he purchased the properties as an investment……………14

       M. Moskovitz claims he merely "hoped" Horowitz would donate the properties.…15

       N. Repayment of Horowitz loans………………………………………………15

III.   PROPOSED CONCLUSIONS OF LAW…………………………………16

       A. Jurisdiction…………………………………………………………16

       B. Constructive Trust………………………………………………………...16

       C. Written contracts of sale and leases…………………………………….…17

       D. Statute of Frauds and Estoppel…………………………………………....17

       E. Relief granted……………………………………………………………..18

       F. Claims dismissed……………………………………………………19

## I.     **INTRODUCTION**

As set forth in the following Proposed Findings of Fact and Conclusions of Law, the evidence presented demonstrates that Michael Horowitz ("Horowitz") and Eli Moskovitz ("Moskovitz"), "close friends" for twenty years, conspired, after a dispute arose between Moskovitz and Shaarei Arazim of Monsey ("Shaarei") in 2009, to deprive Shaarei of its ownership of the properties that Shaarei developed, improved, and paid for, and to use the properties as leverage to extract a payment to Moskovitz of $400,000.

Horowitz denies orally agreeing to convey the properties to Shaarei upon full payment by Shaarei of the mortgages Horowitz obtained to purchase the properties for Shaarei's yeshiva after Shaarei obtained all of the necessary municipal approvals and variance. Shaarei agreed to pay, and for the last underline nine years *has* paid, all expenses for substantial renovation, maintenance, mortgages, taxes, and insurance, *at no cost to Horowitz*, in reliance on this promise. Horowitz anticipated a tax advantage when he eventually "donated" the properties that were fully paid for by Shaarei. Horowitz now denies that he refused to put the true agreement in writing in order to protect his anticipated tax benefit.

It is undisputed that Horowitz chose Moskovitz as his agent for the properties, knowing that Moskovitz was also Shaarei's executive director and had obligations of loyalty to both. He cloaked Moskovitz with apparent authority to speak for him on all matters concerning the property. Moskovitz admits telling Shaarei, potential donors, and families of Shaarei's students that Horowitz was donating (or already had donated) the property to Shaarei. Moskovitz, on behalf of Shaarei, solicited and obtained building fund donations on this basis. But he now says (years later) that he did not tell the truth, and that he only "hoped" that Horowitz would donate the property.

1

The testimony of Moskovitz and Horowitz are not credible. Not only is their testimony contradicted by their own words and by the existing records, but also because they have not produced records that would normally be kept in the ordinary course of business.

The five-year lease agreements extorted from Shaarei by Horowitz after Moskovitz resigned from Shaarei in 2008, do not conflict with the oral agreement to convey the properties when the 25-year mortgage was satisfied by Shaarei's payments.

Although Horowitz, a sophisticated investment advisor, claims he purchased the properties as an investment, he concedes he lives in California and did not examine the properties. He concedes that the income from the properties was essentially a wash after payment of the carrying costs, including the mortgages, taxes and insurance, which was known before the properties were purchased.

When Nathan Kahan, Horowitz' attorney for the purchases and long-time attorney for Shaarei, was deposed and asked the purpose of the purchases, Horowitz refused to allow an answer, claiming privilege, permitting an adverse inference.

The purported unpaid loans, which are independent of the property arrangements, are also unsupported by any ledgers, payment checks, or other usual records. Shaarei's records show loan payments to Horowitz in excess of the $285,000 loans he claims are unpaid.

## II.   <u>PROPOSED FINDINGS OF FACT</u>

### A.   <u>Background</u>

1.   Shaarei Arazim of Monsey ("Shaarei") is a domestic not-for-profit corporation formed in 1999 to promote Jewish education. It operates a yeshiva on the three properties – 52 South Main

Street ("52 S. Main"), 56 South Main Street ("56 S. Main"), and 1 East Funston Avenue ("1 E. Funston"), in Spring Valley, New York.[1]

2.   Stone Biomed Corp. ("Biomed") is a domestic business corporation formed on April 30, 2003, and wholly owned by David Bernstein.

3.   David Bernstein was a founder of Shaarei, has been its president for many years and to date, and is a long-time financial supporter of Shaarei.

4.   Michael Horowitz lives in California where, since 1999, he has provided financial advice to individuals and foundations with at least $1 million available for investment in stocks, bonds, hedge funds, and other financial instruments. He alone holds record title to 56 S. Main and 1 E. Funston, and holds record title with his wife to 52 S. Main.

5.   Alona Horowitz lives in California with her husband, Michael Horowitz. She holds title to 52 S. Main with her husband, and otherwise took no significant active role in the transactions.

6.   Non-Party Eli Moskovitz is a long-time personal friend of Michael Horowitz, and was executive director of Shaarei's yeshiva from 2002 into 2008.

### B.   <u>Shaarei makes plans to purchase property</u>

7.   In or about 2003, Shaarei was operating its yeshiva in rented space, and began looking for property to purchase to re-locate its yeshiva.

8.   After examining many properties that were not appropriate, David Bernstein learned of a three-story brick office building at 52 S. Main Street in Spring Valley, New York, which would be appropriate to house the school.

---

[11]   No references are given in this document for undisputed facts or for anticipated testimony, based on depositions and affidavits. Trial exhibits are referenced where applicable.

9.   Use of the property for a school required a zone change and variances from the Village of Spring Valley.

10.   Use of the property as a school also required purchase of the adjacent property at 56 S. Main to provide sufficient space for school busses to enter and exit, and for additional parking. 56 S. Main was a small office building with existing leases.

11.   In 2003, Shaarei had no plans to purchase the adjacent property at 1 E. Funston, which contained a residence, and was located at the corner of East Funston and South Main.

12.   David Bernstein told Eli Moskovitz (the yeshiva's executive director), Rabbis Freundlich and Rosenman (administrators and teachers at the yeshiva), and the other board members, that if they all committed to raising the funds to purchase and renovate 52 S. Main for the yeshiva, Bernstein would buy the property and hold it until Shaarei was ready to purchase it for Bernstein's actual costs.

13.   Bernstein did not loan money to Shaarei to purchase the property outright, because it would require a substantial portion of his life savings, and he could not afford to donate the property.

14.   Moskovitz, Fruendlich, Rosenman, and Bernstein agreed that Bernstein should buy the property, and that Shaarei would raise the funds to obtain Village approvals, purchase the properties, and renovate 52 S. Main to be used as Shaarei's yeshiva.

15.   There were no signed writings memorializing this arrangement, because all participants trusted each other after years of working together to set up, run, and grow the yeshiva.

### C.   12/03 – Biomed purchases 52 S. Main, & Shaarei begins fundraising

16.   Bernstein's company, Biomed, purchased 52 S. Main on December 1, 2003, with the intention of holding the property until Shaarei received the necessary municipal approvals and

4

sufficient funding to purchase the property from Biomed. Bernstein paid a total of $699,695 in cash from his own funds. Ex. 73. Bernstein then moved his offices to a small office in the building, and paid all carrying costs of the mostly vacant building for the next two years, so that he could transfer the property to Shaarei without leases. Ex.74, 75; Ex. A, D.

17.  Shaarei began raising funds to purchase the two properties and to renovate the main building at 52 S. Main for the yeshiva. The plan was to purchase the adjacent property at 56 S. Main for use as the bus turnaround, and obtain approvals and variances from the Village for developing the properties for the yeshiva, and then to buy 52 S. Main from Biomed when all the pieces were in place. 56 S. Main contained a small office building with existing tenants that would support its own costs, including mortgage and taxes.

18. 1 E. Funston later became available, had an existing residential tenant, and was included in the development plans.

19. Shaarei's weak financial condition prevented it from obtaining a mortgage loan.

### D.   Horowitz' promises

20.  Shortly after the purchase of 52 S. Main by Biomed, Eli Moskovitz told Bernstein, other board members, the staff of Shaarei, and all prospective donors, including parents of the yeshiva's students, that his long-time personal friend, Michael Horowitz, who had previously loaned and donated funds to Shaarei at Moskovitz' request, had agreed to use his good credit history to obtain funding for the purchase of the properties for Shaarei.

21.  Moskovitz advised that Horowitz agreed that Shaarei would pay all of the costs not covered by the rent collected, until the mortgages were satisfied, at which time Horowitz would donate the properties to Shaarei. Horowitz would not incur any costs, and expected to receive a charitable tax deduction for his generosity.

22.  Shaarei accepted Moskovitz' representation as truth, since Moskovitz was Shaarei's executive director and had previously obtained donations for Shaarei from his long-time personal friend, Michael Horowitz.

23. There was no signed writing from Horowitz memorializing this agreement.

24.  Shaarei's reliance on Horowitz' promise was reasonable under the circumstances.

25.   In reliance on Mr. Horowitz' promise, Shaarei began a capital campaign to raise funds to develop, purchase, and renovate the properties to operate the yeshiva. Moskovitz's fundraising letters on behalf of Shaarei alternately state either that Shaarei was going to purchase the buildings from Horowitz at cost, or that Shaarei already owned the buildings. Estimated renovation costs ranged from $300,000 to $700,000. Shaarei received donations and loans over a period of years based on these representations. Ex. 12, 13, 14, 15, 62, 63.

**E.      5/04 – Purchase of 56 S. Main**

26.  On January 6, 2004, Moskovitz approached attorney Nathan Kahan and told him the yeshiva was interested in buying a building. On February 11, 2004, a check for $3000 was given by Shaarei to Kahan. Ex.72.

27. On May 11, 2004, Horowitz purchased 56 S. Main at the offices of attorney Nathan Kahan for $400,000. Moskovitz attended the closing as a representative of both Horowitz (by virtue of a power of attorney to act as Horowitz' agent for real estate transactions), and of Shaarei, as its executive director. Shaarei was not a party to the transaction, but was the intended beneficiary of the transaction. Ex.72.

28.  Two checks were issued by Shaarei to "Nathan Kahan, as attorney" on May 11, 2004, in the amounts of $9,370 and $6,000. Ex.72.

29.  Horowitz purchased the property by making a $100,000 down-payment and obtaining a $300,000 loan from GreenPoint Mortgage Funding, Inc., secured by a 25-year note and mortgage. Ex.72.

30.  Two weeks later, on June 1, 2004, Shaarei reimbursed Horowitz, for the $100,000 down payment advanced by Horowitz. The reimbursement check includes a notation reading "down pymnt 56 S Main St". Ex.24.

31.  The next month, in July of 2004, Horowitz and Bernstein jointly submitted a "Petition to Change Zoning Designation" to the Village of Spring Valley to permit Shaarei to operate a private secondary school at Biomed's 52 S. Main property, with school bus access and parking on Horwowitz' 56 S. Main property. Ex. 71.

32.  There was no signed writing governing the parties' relationship. For the next four years, Shaarei paid to Horowitz' company carrying costs of the properties less whatever rent Shaarei collected from the other tenants. The amount paid by Shaarei, therefore, varied each month, and was always reduced by the rent collected from the other tenants, without objection from Horowitz.

33.  The property records were maintained in Shaarei's offices at 56 S. Main by Moskovitz, who was Shaarei's employee. Horowitz did not pay Moskovitz for being Horowitz' agent for the properties. Until 2008, Moskovitz collected the rents from the tenants (sometimes the rent was collected by Pesach Weinstein, Shaarei's assistant administrator), and paid all mortgage payments, taxes and insurance premiums. Shaarei's payments were made by Moskovitz directly accessing Horowitz' bank accounts as directed by Horowitz. Ex. U, W, Y, Z, AA, BB, CC, DD RR, SS, TT, UU, VV, WW, XX, YY, ZZ, AAA.

7

34.  Moskovitz served as agent of both Shaarei and Horowitz for the purposes of purchasing and managing the properties.

35.  After Moskovitz resigned in 2008, he came back and took all of the real property records from Shaarei's business office located at 56 S. Main. None of the records have been returned.

36.  Horowitz paid nothing for the purchase or carrying costs of the property.

**F.     1/05 – Purchase of 1 E. Funston**

37.  When 1 East Funston became available for purchase, Shaarei decided to purchase it. It was a residential property with an existing tenant. 1 E. Funston was expected to pay its own carrying costs from the rent collected, just like 56 S. Main.

38.  Moskovitz informed Shaarei that Horowitz agreed to purchase the property under the same arrangement as 56 S. Main, including donation of the property to Shaarei upon Shaarei's satisfaction of all financing obligations. Mokovitz was authorized by Horowitz to act on Horowitz' behalf in all matters concerning the properties. Moskovitz acted as Horowitz' agent for the prior eight months for the purchase and management of 56 S. Main, as authorized by Horowitz.

39.  Horowitz purchased 1 E. Funston on January 27, 2005, for $175,000. Moskovitz again attended the closing at the office of attorney Nathan Kahan, and signed all closing documents on behalf of Horowitz pursuant to a power of attorney. Moskovitz was also present on behalf of Shaarei, who was the intended beneficiary, although Shaarei was not a party to the contract to purchase the property. Ex.76.

40.  Horowitz was reimbursed for all funds he advanced for the purchase. Shaarei paid the line of credit Horowitz obtained to repay himself the funds he advanced at the closing. Shaarei also issued two checks to Horowitz, each for $50,000, on August 1, 2005, bearing the notations

"Payment #2 for purchase" and "Payment #3 for purchase. Horowitz cashed both checks without objection. Ex.6, 7.

41.  There was no signed written agreement governing the relationship between Shaarei and Horowitz for 1 East Funston. For the next three years, Shaarei collected the rent and paid to Horowitz' company all carrying costs in excess of the rent collected, as it did for 56 S. Main, without objection from Horowitz.

42.  Shaarie's continued reliance on the promise to convey the properties was reasonable under the circumstances.

### G.  <u>Horowitz confirms to Bernstein the promise to donate the properties</u>

43.  Shaarei expended substantial sums for a municipal attorney, architects, engineers, and municipal fees, and the Village approved the plans for development of the properties on December 20, 2005. Ex. 25 through 61, 67, 88.

44. Sometime in 2005, a real estate broker told Bernstein that Biomed's property at 52 S. Main was then worth $1.1 million, because the Orthodox Jewish community had increasing demand for yeshiva properties in the area. Bernstein believed that this was true, and, after carrying all expenses of the property for two years, pressured Shaarei to buy the property quickly, or he would have no choice but to sell it to another buyer for a profit.

45.  Moskovitz again reported that he had arranged for Horowitz to purchase the property under the same terms as the other two properties.

46.  Bernstein requested a meeting with Horowitz personally to confirm the arrangement, because Horowitz would not put the arrangement in writing.

47.  Bernstein met with Horowitz at Bernstein's home in late 2005. Moskovitz was present. Bernstein thanked Horowitz for his help over the years, and for his agreement to donate the three

properties to Shaarei once the mortgages were paid. Horowitz confirmed that this was the arrangement for all three properties, and stated that he would not encumber the properties. Horowitz said that he could not give Shaarei anything in writing to memorialize his promise or Shaarei's obligation to pay all costs, because his tax advisor told him that memorializing his donation now could significantly reduce the large tax deduction he expected later. His tax deduction was the only monetary benefit for him from the transactions.

48.  After the meeting with Horowitz, Bernstein drafted a written agreement to memorialize the donation of the properties upon the pay off of each mortgage. Ex.11. Bernstein gave the draft agreement to Moskovitz, who later reported to Bernstein that Horowitz had signed an agreement that gave Bernstein all that he wanted in the agreement. Horowitz concedes that he was satisfied with Bernstein's draft agreement after changes were made, but never signed it. Bernstein never saw a signed agreement.

49. Bernstein believed Moskovitz because all of the promises that Moskovitz said Horowitz had made over the years were personally confirmed to Bernstein by Horowitz when they met, and because he knew Moskovitz wanted the yeshiva to thrive, and Horowitz was Moskovitz' good friend and donated and loaned Shaarei substantial sums.

50. At the time of the sale of 52 South Main to Horowitz, Bernstein believed the property was worth $1.1 million, based on what a broker told him. Bernstein would not have sold the property to Horowitz for $750,000, unless he was certain that it would be held for the benefit of Shaarei.

51.  Bernstein's and Shaarei's reliance on Horowitz' promise to convey all three properties to Shaarei was reasonable under the circumstances.

52.  On November 30, 2005, Horowitz signed a Declaration, which was then signed by Bernstein on December 27, 2005, granting an access and parking easement to run with the land and to be included in all future conveyances, as required on Shaarei's approved site plan. Ex. 70.

### H.    2/1/06 – Horowitz purchases 52 S. Main

53.  In reliance on Horowitz' express promise to Bernstein concerning all three properties, Bernstein sold 52 S. Main to Michael and Alona Horowitz on February 1, 2006, for $750,000, with no down payment. Moskovitz signed for the Horowitzes with powers-of-attorney. It was a friendly transaction. Bernstein believed that Kahan was representing him and the yeshiva, because Bernstein had met with Kahan several times during the process and Kahan answered several of Bernstein's questions. Kahan prepared all of the papers for Bernstein to sign. Ex.8, 75; Ex. H, I, J.

54.  Kahan says that he represented only the Horowitzes on the purchase of 52 S. Main. Kahan told Bernstein that the properties were being purchased by the Horowitzes on behalf of Shaarei. At Kahan's deposition, the Horowitzes refused to allow Kahan to testify about the purpose of the transaction, claiming privilege.

55.  There was no down payment, and the bank loaned the full purchase price of $750,000. Therefore, the bank held back $187,500 of the loan proceeds as "collateral for equity paydown," to be released to Biomed after twenty-five percent of the mortgage was paid. Bernstein agreed to wait to be paid $187,500 of the purchase price. Ex. 75.

56.  As with the other properties, Shaarei paid all costs, including substantial sums in renovation costs. Horowitz paid nothing.

### I.     Moskovitz resigns as executive director

57.   Shaarei was never totally financially self-supporting through tuition, and towards the end of 2007, Shaarei needed more and more funds, and was having difficulty paying its ongoing expenses and repaying loans. Shaarei decided that the board of directors needed to exercise more oversight and advised Moskovitz of this. Moskovitz was insulted, and resigned. Moskovitz claimed that Shaarei owed him hundreds of thousands of dollars.

58.   After he resigned, Moskovitz returned to Shaarei's office at 56 S. Main, and took all of records for the properties from Shaarei's office, and has never returned them, despite Shaarei's demand that he do so.

59.   Shaarei later learned that Moskovitz had fallen behind in paying the taxes on the properties. When Horowitz demanded that Bernstein personally pay the delinquencies, Bernstein did so in order to protect the yeshiva's property, although he had no personal obligation to do so.

### J.     Horowitz demands that Shaarei sign leases in 2008

60.   In 2008, with his close friend Moskovitz gone, and with no writings confirming Shaarei's obligation to pay the mortgages, taxes, and all of the property expenses, Horowitz threatened to sell the properties unless Shaarei signed five-year leases for the three properties. He continued to refuse to put in writing the true agreement that Shaarei would pay all costs, and Horowitz would donate the properties to Shaarei upon satisfaction of the mortgages, because it could reduce the amount of Horowitz' eventual tax deduction.

61.   By this time, Shaarei had paid hundreds of thousands of dollars of donors' and lenders' funds in reliance on Horowitz' promise to donate the properties to Shaarei, and could not afford to have the properties sold out from under it. Although the leases required Shaarei to pay more than it had been paying since the properties were purchased, and although the five-year leases

12

contained onerous and unconscionable terms, Bernstein felt that Shaarei had no option but to sign the leases, which Bernstein did.

62.  The leases required, for the first time, fixed monthly rent payments equal to the mortgages and taxes, rather than Shaarei paying the difference between the total revenues and carrying costs in any given month. Horowitz, for the first time, would be making a profit from the properties in the amount of the tenants' rent payments, which previously had been deducted from Shaarei's payments to Horowitz. The rental amount for Shaarei's use of its office space in 56 S. Main was the full amount of the mortgage, taxes, and insurance, although there were four other tenants occupying 56 S. Main. Shaarei was henceforth responsible for paying the rental amount of any tenant who vacated the premises. Shaarei had become a guarantor of occupancy of 56 S. Main. Ex. L, M, N.

63.  Shaarei did not interpret the five-year leases as a repudiation of Horowitz' agreement to give title to Shaarei once Shaarei paid off the 25-year mortgages. Shaarei recognized that Horowitz wanted a writing requiring Shaarei to pay all expenses, as it had always done, but that Horowitz was still not willing to jeopardize his potential future tax credit by putting the real agreement in writing.

### K.    Horowitz first disavows his promise to donate the properties

64.  Horowitz never told Bernstein or Shaarei that he was disavowing his promise to donate the properties to Shaarei, and Shaarei continued to pay the monthly amount of the leases (the amount of the monthly mortgages, taxes, and insurance obligations), and also continued to pay all maintenance expenses.

65.  In December of 2009 and January of 2010, a for-sale sign appeared on the yeshiva property. That was the first indication to Shaarei that Horowitz might not honor his promise to

donate the properties to Shaarei. Horowitz insisted that Shaarei resolve the issue of his claimed unpaid loans (which could not be confirmed in Shaarei's records) before resolving the status of the real property. Horowitz also insisted that Shaarei pay his friend Moskovitz $400,000.

**L.     Horowitz' claim that he purchased the properties as an investment**

66.  Horowitz' claim that he purchased the properties as an investment is not credible. He concedes that the properties paid for themselves, but did not make a profit. There is no evidence that Horowitz, who lives in California, conducted any due diligence before purchasing the New York properties at the request of his long-time friend, Moskovitz, who asked Horowitz to help the yeshiva.

67.  It is not credible that Horowitz, who is a sophisticated financial investor, would purchase the properties as an investment, and "rent" to the yeshiva for four years without any written leases.

68.  It is not credible that Horowitz, a sophisticated financial advisor, considered the properties a good investment, when there was no profit to Horowitz, which Horowitz admits.

69.  It is not credible that Shaarei was intended to be a mere tenant, after paying literally all costs to purchase and maintain the property, while Horowitz incurred no expense at all.

70.  Horowitz' only risk was that the notes held in his name would not be timely paid by Shaarei. The notes were well secured by the value of the property improved at Shaarei's expense.

71.  Horowitz' claims are a convenient recent fabrication made up after his long-time friend, Moskovitz, resigned from the yeshiva, leaving it without funds to ensure payment of the notes signed by Horowitz. In order to protect himself, Horowitz demanded leases. He later disavowed his agreement to convey the property to Shaarei, and demanded that Shaarei pay his friend Moskovitz $400,000.

### M.   Moskovitz claims he merely "hoped" Horowitz would donate the properties

72.  Moskovitz admits that he represented to potential donors that the Shaarei either owned the buildings or that Horowitz promised to donate the properties to Shaarei.

73.  Moskovitz now says his representations were not true, and that he merely "hoped" that Horowitz would donate the buildings.

74.  Moskovitz is not a credible witness.

### N.   Repayment of Horowitz loans

75.  Horowitz claims that Shaarei owes him $285,000 plus interest in unpaid loans. To date, Horowitz has not produced an accounting of all loans he made to Shaarei, and what was paid back. He has not produced the usual business records kept for loans and payments – no ledgers, check registers, or other usual records. It is not credible that an experienced financial advisor and investor does not have records of each loan given, and each payment made on each loan.

76.  Horowitz' claim that the loans referred to in the Iskas have not been paid is not supported by records.

77.  Shaarei's records credibly evidence loan payments to Horowitz of $240,000. Additionally, when the mortgage on 52 South Main was paid down by 25%, the bank released the escrowed $187,500 plus interest (totaling $208,631) to Horowitz, who was the borrower, not to Biomed, the seller. These funds were still owed to Biomed for the purchase price of 52 S. Main. Bernstein allowed Horowitz to retain the funds as a reduction of any outstanding loan amounts that might be due Horowitz.

78.  Horowitz unilaterally decided not to credit the bank funds to the claimed outstanding loans, deciding instead to classify the funds as purported security for repairs and the issuance of

a final certificate of occupancy. There is no agreement, neither written nor oral, to support Horowitz' allocation of these funds as security for anything.

**III.      PROPOSED CONCLUSIONS OF LAW**

**A.      Jurisdiction**

1.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**B.      Constructive Trust**

2.   Horowitz holds title to the three properties in constructive trust for Shaarei, which has proven the elements of a constructive trust: a confidential and fiduciary relationship with Horowitz, an express promise by Horowitz to convey the properties to Shaarei upon payment of the mortgages, a transfer of funds and property in reliance on that promise, and unjust enrichment by Horowitz. *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978); *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212-213 (2d Cir. 2004).

3.   A confidential or fiduciary relationship between Shaarei and Horowitz is evidenced, as a matter of fact and law, by Horowitz designating Moskovitz as his agent for purposes of purchasing and managing the properties, knowing that Moskovitz was also acting as agent for Shaarei, and by Horowitz having been a long-time patron of Shaarei before he purchased the properties. *Panetta v. Kelly*, 17 A.D.3d 163 (1st Dep't 2005).

4.   Horowitz made Moskovitz his agent for the purpose of purchasing and managing the properties, and conducted all property-related transactions and business exclusively through Moskovitz (except for one meeting with Bernstein in late 2005), thereby cloaking Moskovitz with apparent authority. *Hallock v. State of New York*, 64 N.Y.2d 224 (1984). Ex.72, 75, 76.

5.   As a matter of fact and law, Shaarei reasonably relied on Horowitz' promise to convey the properties to Shaarei once the mortgages were paid, as evidenced by, among other things, Horowitz cashing, without objection, three down payment checks for purchase of the properties; the many representations by Moskovitz that Horowitz had made the promise; Horowitz' express promise to Bernstein before Biomed transferred the property to Horowitz; and Bernstein's agreement to allow the bank to withhold $187,500 of the purchase price as collateral for payment of Horowitz' mortgage. Ex. 75.

6.   Horowitz was unjustly enriched by, among other things, Shaarei making all mortgage payments, collecting all rents from other tenants, paying all taxes and insurance premiums, paying for extensive renovations to the properties, and quickly reimbursing Horowitz for the limited funds advanced by him, making it inequitable for Horowitz to retain these benefits, considering the circumstances of the transfers and the relationship of the parties. *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999).

### C.   Written contracts of sale and leases

7.   The written contracts of sale (which deal only with the acquisition of the properties), and the leases (which deal only with tenancy while the mortgages were being paid) do not conflict, as a matter of fact and law, with the oral promise to convey the properties to Shaarei upon satisfaction of the mortgages, and therefore do not bar the imposition of a constructive trust. *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212-213 (2d Cir. 2004).

### D.   Statute of Frauds and Estoppel

8.   General Obligations Law § 5-703(1) and (3) do not bar proof the oral agreements in this case, by reason of partial performance. The acts of Shaarei and Bernstein are unequivocally and

rationally referable only to the agreement to transfer title to Shaarei upon satisfaction of the mortgages. GOL § 5-703(4); *Panetta v. Kelly*, 17 A.D.3d 163, 165, (1st Dept. 2005).

9.   The defendants are, therefore, equitably estopped from asserting that the lack of a writing renders the oral agreements unenforceable.

### E.   <u>Relief granted</u>

10. Plaintiff Shaarei is granted judgment on the first cause of action declaring that the defendants hold title to the three properties in constructive trust for Shaarei. The defendants are directed to: a) convey the properties to Shaarei within fifteen days of satisfaction of the three mortgages; and b) accept Shaarei's offer to pay off the mortgages at any time prior to the date the mortgages are due to be satisfied.

11.  [*In the event Shaarei is not granted a constructive trust:*] Shaarei is granted judgment against Defendant Michael Horowitz in the sum of $219,370 paid by Shaarei towards the purchase price of 56 S. Main and 1 E. Funston, with interest calculated from the date of each payment.

12.  [*In the event Shaarei is not granted a constructive trust, and Shaarei is not given a credit for payment of $187,500 against the loans claimed by the defendants:*] Plaintiff Biomed's claim for constructive trust on behalf of Shaarei is amended pursuant to Fed. R. Civ. P. 15 to be a claim for constructive trust on behalf of Biomed, and for judgment in favor of Biomed in the sum of $187,500 plus interest from February 1, 2006, and upon amendment, Biomed is granted judgment on the first cause of action declaring that the defendants hold 52 S. Main in constructive trust for Biomed until Biomed is paid $187,500 plus interest from February 1, 2006, and Biomed is awarded judgment against the defendants in that amount.

13.    Plaintiffs Shaarei and Biomed are granted judgment on the second cause of action declaring that defendants are estopped from asserting defenses to the validity of the oral agreements, based upon partial performance of the oral agreements, which are rationally and unequivocally referable only to the oral agreements. *Panetta v. Kelly*, 17 A.D.3d 163, 165, (1st Dept. 2005).

14.   The plaintiffs are granted judgment on the third cause of action, and the defendants are permanently enjoined from selling, mortgaging or otherwise encumbering or disposing of the subject properties, unless an order is obtained from this Court or from the Supreme Court of the State of New York in the County of Rockland upon a finding that Shaarei has materially defaulted in its obligations under the oral agreements.

### F.    Claims dismissed

15.   The defendants' first through eleventh affirmative defenses are dismissed.

16.   The defendants' first counterclaim for unpaid loans is dismissed.

17.   The defendants' second counterclaim for amounts due under the written lease agreements is dismissed.

18.   The defendants' third counterclaim for a declaration that the defendant(s) own the three

(continued on next page)

subject properties, and for enforcement of the lease agreements is dismissed.

Dated: October 11, 2013
      Nanuet, New York

                      Respectfully submitted,

                      SAVAD CHURGIN

By: _____
                      JOSEPH A. CHURGIN
                      Attorneys for Plaintiff
                      Shaarei Arazim of Monsey and
                      Stone Biomed Corp.
                      55 Old Turnpike Road, Suite 209
                      Nanuet, New York 10954
                      Tel. (845) 624-3820
                      Fax. (845) 624-3821