UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAAREI ARAZIM OF MONSEY, and
STONE BIOMED CORP.,

                    Plaintiffs,

          - against -

MICHAEL HOROWITZ and ALONA
HOROWITZ,

                    Defendants.

10 Civ. 7099 (VB)


**DEFENDANTS' PROPOSED
FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**


Defendant/Counterclaim-Plaintiff Michael Horowitz and Defendant Alona Horowitz

respectfully submit these Proposed Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1.      The properties at issue in this case are three adjoining properties at 56 South Main

Street, ("56 South Main"), 1 East Funston Avenue ("1 East Funston") and 52 South Main Street

("52 South Main") in Spring Valley, New York (together, the "Properties").

### <u>The Plaintiffs</u>

2.      Plaintiff Shaarei Arazim of Monsey ("Shaarei Arazim") is a non-profit

corporation that operates a religious high school in Spring Valley, New York.  David Bernstein

("Bernstein") was the co-founder and first president of Shaarei Arazim.

3.      Shaarei Arazim has used 52 South Main Street as its primary facility, 56 South

Main Street as an office, and 1 East Funston Avenue as a dormitory.

4.      Plaintiff Stone Biomed Corp. ("Biomed") is a domestic corporation located in

Monsey, New York.  Biomed is solely owned by Bernstein, who was the President of Shaarei

Arazim during all periods relevant to this action.

### The Defendants

5.      Defendants Michael and Alona Horowitz are husband and wife who, during all periods relevant to this action, have been residents of California.

6.      The parties agree that Alona Horowitz's role is limited to her status as co-owner of 52 South Main Street, and that she was not otherwise involved in any of the events that are the basis for this lawsuit and counterclaims.

### Mr. Horowitz's Friendship with Eli Moskovitz

7.      After completing high school in California in 1992, Mr. Horowitz spent seven years living and studying Jewish texts in Israel.  There, he met and became close friends with Mr. Eli Moskovitz, a non-party to this action.

8.      Mr. Moskovitz attended religious schools (yeshivas) in Cleveland, Philadelphia, Boston and Israel.  He did not attend college and has never taken any courses in real estate, business or management.

9.      Mr. Horowitz and Mr. Moskovitz continued their friendship after Mr. Horowitz moved back to Los Angeles in 1999 and Mr. Moskovitz moved back to New York, his home. Mr. Moskovitz and Mr. Horowitz stayed in touch, mostly by phone.  They got together whenever Mr. Horowitz was in New York, and their families celebrated milestones together.

10.      Mr. Moskovitz decided to pursue a career in Jewish religious education, which means that he often earns less than he needs to support his family.  Mr. Horowitz, based on their friendship and his religious principles, has helped Mr. Moskovitz and his family over the years by providing financial assistance in the form of interest-free loans without a term for repayment.

## Mr. Horowitz's Personal Background

11.     After returning to Los Angeles, Mr. Horowitz worked as a financial advisor for Morgan Stanley from 2000 through 2008.  In or about 2008, he founded Monarch Capital, which provides financial advice to high net worth individuals, families and foundations.

12.     Mr. Horowitz is also a private investor in both publicly and privately traded companies, as well as real estate. He has purchased and sold real estate in Los Angeles, including two residential properties that he rented while owning them.

13.     Mr. Horowitz is a philanthropist who has made significant donations and loans to religious institutions, including synagogues and yeshivas, in Los Angeles, New York, Israel and other communities.  He has also provided financial support to individual members of the Jewish communities in California, Maryland and New York, including Mr.  Moskovitz.

14.     Since returning from Israel, Mr. Horowitz has provided financial support to over 100 religious institutions, primarily in his own community in Los Angeles, but also in Israel, New York and elsewhere.

15.     Around the time that Mr. Horowitz purchased the Properties that are at issue in this lawsuit, he helped form a synagogue in Los Angeles called Adas Torah.  Soon after formation, Adas Torah outgrew the space it had been renting in a local hotel and sought to purchase a building on South Beverly Drive in Los Angeles.  Adas Torah did not have sufficient funds to purchase the building and could not qualify for a mortgage without a guarantor. Therefore, Mr. Horowitz and other supporters personally guaranteed Adas Torah's mortgage.

16.     They structured the transaction so that Adas Torah purchased and owned the property on South Beverly Drive and was the mortgagor, while Mr. Horowitz and other supporters were the guarantors of the mortgage.  This way, Adas Torah did not have to pay rent

to a landlord, and Adas Torah could benefit from the (hopeful) appreciation in the property.  In fact, that is exactly what occurred.

17.     Adas Torah recently purchased a much larger and more expensive property.  Adas Torah sold it's original property for a profit, and the profits became part of Adas Torah's investment in the new property.  The loan for this new property was guaranteed by Mr. Horowitz's parents, because Adas Torah still is not in position to qualify for a mortgage without guarantors.  Title to this new property is also in the name of Adas Torah, not the Horowitzes.

18.     Mr. Horowitz also helped form an organization known as Merkaz Torah Community Kollel.  Merkaz employs rabbinical staff both to learn and teach community members.  The rabbinical staff and their families need places to live.  So Merkaz purchased three apartment buildings.  Mr. Horowitz personally guaranteed mortgages on all three properties.  Title to all three properties is in the name of Merkaz, not the Horowitzes.

19.     Again, the transactions were structured so that Merkaz Torah purchased and owned the properties in Los Angeles and was the mortgagor on three mortgages, while Mr. Horowitz was the guarantor on those three mortgages.

20.     In all of those real estate transactions, unlike the transactions in this case, the institution, not Mr. Horowitz, bought the properties and Mr. Horowitz and/or his parents facilitated their purchases by guaranteeing the institutions' mortgages.  If Mr. Horowitz wanted to facilitate Shaarei Arazim's ownership of the Properties, he certainly could have offered to guarantee its debt.  However, in this case, that is not what he offered to do.

### Mr. Horowitz Helped Support Shaarei Arazim

21.     In the early 2000s, Mr. Moskovitz began working for Shaarei Arazim, a newly-established religious high school for boys, in Rockland County, New York.  Mr. Moskovitz

4

started as Shaarei Arazim's head of secular studies and soon became Shaarei Arazim's executive director.

22.     Mr. Moskovitz contacted Mr. Horowitz as a potential source of financing for the new school, which badly needed money to pay salaries, rent, utilities and other costs.

23.     Mr. Horowitz supported Mr. Moskovitz professionally by both loaning and donating money to Shaarei Arazim.   To help Mr. Moskovitz get his career off the ground, Mr. Horowitz provided significant loans to Shaarei Arazim, totaling well over $300,000.  He also made direct contributions to the school in smaller amounts.

24.     Mr. Moskovitz would pay down the loans when Shaarei Arazim had extra money, and Mr. Horowitz would lend Shaarei Arazim more money when it needed more help.  Because of their close friendship, Mr. Horowitz and Mr. Moskovitz often did not fully document these transactions.

25.     Mr. Horowitz had no connection with Shaarei Arazim other than Mr. Moskovitz, and little connection with the local Jewish community it serves.  He made donations and loans to Shaarei Arazim solely because of his friendship with Mr. Moskovitz.

## Mr. Bernstein Purchased 52 South Main Street

26.     In December 2003, David Bernstein purchased 52 South Main Street through one of his companies (Biomed) from Doro Equities, an unrelated entity, for $650,000.

27.     The Property at 52 South Main Street was improved by a three story brick office building with a basement, which could potentially meet Shaarei Arazim's needs for a school building.

28.     Mr. Bernstein, the President of Shaarei Arazim, did not donate or lend funds to Shaarei Arazim to enable it to purchase the property, nor did he guarantee a loan or mortgage to

buy the property.  Instead Mr. Bernstein treated the property at 52 South Main Street as a real estate investment.

29.     Shaarei Arazim began the process of seeking a zoning change and site approval for 52 South Main Street to permit Shaarei Arazim to operate a school there.  It retained architects and engineers to develop plans for converting the building located at 52 South Main Street into a school building.

30.     Through this process, Shaarei Arazim learned that in order to convert 52 South Main Street to a school building, it would need an easement for its school buses to come and go through an adjoining property at 56 South Main Street.  The property at 56 South Main Street is improved by a two-and-a-half story office building.

31.     Shaarei Arazim did not have the funds to purchase 56 South Main Street and could not get a mortgage to do so.

### Mr. Moskovitz Told Mr. Horowitz About the Properties

32.     In or about early 2004, Mr. Moskovitz told Mr. Horowitz that Shaarei Arazim had outgrown the space it was renting.

33.     At or around the same time, Mr. Moskovitz learned that Biomed had purchased 52 South Main Street.  Mr. Moskovitz told Mr. Horowitz about Shaarei Arazim's plans for 52 South Main Street and its need for access through 56 South Main Street. Shaarei Arazim had neither the money nor the credit to buy 56 South Main Street.

34.     Mr. Moskovitz asked Mr. Horowitz to purchase the property at 56 South Main Street in order for the school to obtain the drive-through easement.  Mr. Moskovitz told Mr. Horowitz that 56 South Main Street was occupied by office tenants paying rent and that if any of those tenants were to vacate, Shaarei Arazim would lease the empty offices.

35.     Based on the purchase price, the rents being paid by the existing tenants (and potentially by Shaarei Arazim), the availability of financing at attractive rates, and the fact that the building would be directly adjacent to a brand new school, Mr. Horowitz determined that purchasing 56 South Main Street offered a reasonable investment opportunity as well as a charitable one.

36.     Mr. Horowitz agreed to purchase 56 South Main Street and allow Shaarei Arazim's school buses to pass through the Property on their way to 52 South Main Street.

### Mr. Horowitz Purchased 56 South Main Street

37.     Mr. Horowitz purchased 56 South Main Street on or about May 11, 2004.  The seller was South Main Realty, LLC, an entity with no connection to Shaarei Arazim or this litigation.  A copy of the deed and the contract of sale are Exhibits B and GGG.

38.     Mr. Horowitz personally paid the full purchase price of $400,000 with a cash down payment of $100,000 and a mortgage for $300,000.  Shaarei Arazim did not contribute any financing or support whatsoever to Mr. Horowitz's purchase of 56 South Main Street.

39.     The 56 South Main purchase agreement, mortgage, and all other transaction documents are in Mr. Horowitz's name as buyer/owner.  They do not contain any provision that would require him to transfer or donate 56 South Main Street to Shaarei Arazim or anyone else.

40.     The property at 56 South Main Street was improved with an office building leased to tenants unaffiliated with Shaarei Arazim.  These tenants paid rent to Mr. Horowitz, who paid the mortgage, taxes and insurance.

41.     Shaarei Arazim also occupied office space at 56 South Main Street and paid rent to Mr. Horowitz for office space.  Because of his relationship with Mr. Moskovitz, who was the executive director of Shaarei Arazim, Mr. Horowitz did not require Shaarei Arazim to sign written leases for the portion of 56 South Main Street it was leasing.

42.     Mr. Bernstein, who owned 52 South Main Street at the time, sought a zoning change to permit his property to be used as a school building.

43.     In July 2004, Mr. Horowitz joined Mr. Bernstein's petition filed with the Village of Spring Valley seeking the zoning change.  By joining the petition, Mr. Horowitz informed the Village that he would give the school access to 56 South Main Street for buses and parking as Mr. Moskovitz had asked Mr. Horowitz to do.

44.     In 2005, the Village of Spring Valley granted the zoning change and site approvals that would permit Shaarei Arazim to use 52 South Main Street as a school.

45.      In December 2005, as owner of 56 South Main Street, Mr. Horowitz granted an easement to Biomed, as owner of 52 South Main Street, as Mr. Moskovitz had requested.

### Mr. Horowitz Purchased 1 East Funston

46.     Soon after Mr. Horowitz purchased 56 South Main Street, Mr. Moskovitz told him that another property adjacent to 56 South Main Street and 52 South Main Street was available for purchase.  That property was located at 1 East Funston Avenue and was improved by a residence.

47.     Shaarei Arazim did not have the funds to purchase 1 East Funston Avenue and could not get a mortgage to do so.

48.     Mr. Horowitz purchased 1 East Funston in January, 2005.  The seller was Alexander Dorogoff who also had no connection to Shaarei Arazim or this litigation.  A copy of the deed and the contract of sale are Exhibits C and HHH.

49.     Mr. Horowitz paid the purchase price of $175,000 in cash.  He later took a mortgage refinancing the purchase for $270,000.  Shaarei Arazim did not contribute any financing or support whatsoever to Mr. Horowitz's purchase of 1 East Funston.

50.     The 1 East Funston purchase agreement, refinancing mortgage, and all other transaction documents are in Mr. Horowitz's name as buyer/owner.  They do not contain any provision that would require him to transfer or donate 1 East Funston to Shaarei Arazim or anyone else.

51.     Just like 56 South Main Street, there were tenants occupying the Property and Mr. Moskovitz agreed that Shaarei Arazim would lease from Mr. Horowitz any portions of 1 East Funston which became vacant.

52.     Because Shaarei Arazim planned to occupy 1 East Funston if and when the other tenants vacated, Mr. Horowitz determined that purchasing the property offered a reasonable investment opportunity as well as a charitable one.

53.     At the time that Mr. Horowitz purchased 1 East Funston, there were tenants in occupancy who paid rent to him.  After those tenants left, Shaarei Arazim rented the building and paid rent to him.  Because of his relationship with Mr. Moskovitz, who was the executive director of Shaarei Arazim, Mr. Horowitz did not require Shaarei Arazim to sign leases for those portions of 1 East Funston occupied by Shaarei Arazim.

54.     Mr. Horowitz paid the mortgage, taxes and insurance for 1 East Funston.

### Mr. and Mrs. Horowitz Purchased 52 South Main Street

55.     In December 2005, Mr. Moskovitz introduced Mr. Horowitz to David Bernstein, the owner of plaintiff Stone Biomed.

56.     Mr. Bernstein was a member of the local Jewish community and President of Shaarei Arazim.  Mr. Bernstein is a successful and sophisticated businessman and real estate investor, and a supporter of the school.

57.     Mr. Horowitz met Mr. Bernstein at his home in New York, where they discussed Mr. Horowitz's continuing financial support to the school.  This was the first time that Mr. Bernstein and Mr. Horowitz had ever met or spoken.

58.     Mr. Bernstein's company Biomed owned 52 South Main Street, which it had purchased in December 2003 for $650,000.

59.     Mr. Horowitz's conversation with Mr. Bernstein at his home in New York was very brief, no more than five minutes in length.  Mr. Bernstein and Mr. Horowitz agreed that Mr. Horowitz would purchase 52 South Main Street from Biomed for $750,000 resulting in a profit on the sale for Mr. Bernstein's company Biomed.

60.     During their short meeting, Mr. Bernstein also sought to negotiate an option to repurchase 52 South Main Street from Mr. Horowitz at a later date.  Mr. Horowitz and Mr. Bernstein did not reach any agreement regarding any repurchase option.

61.     At no time in that five-minute conversation with Mr. Bernstein, or ever, did Mr. Horowitz promise to sell, donate or contribute 52 South Main Street or either of the other two properties to Shaarei Arazim.

62.     At no time in that five-minute conversation with Mr. Bernstein, or ever, did Mr. Horowitz tell Mr. Bernstein that he would not put the alleged promise into writing because of future income tax considerations.

63.     After Mr. Horowitz returned home to California, Mr. Bernstein instructed Mr. Moskovitz to send to Mr. Horowitz a document entitled "Property Purchase Option," (Exhibit EEE).

64.     The "Property Purchase Option" proposed an agreement regarding Mr. Horowitz's properties (56 South Main Street and 1 East Funston) and Biomed's property (52

10

South Main Street).  Specifically, the document proposed that Mr. Horowitz would donate the Properties to Shaarei Arazim after the mortgages had been paid off.

65.     This was a new term that Mr. Horowitz and Mr. Bernstein had not discussed during their meeting in New York.  Mr. Horowitz had never discussed this new term with Mr. Bernstein, or anyone else, and he did not agree to it.

66.     Mr. Horowitz told Mr. Moskovitz that he would not sign Mr. Bernstein's "Property Purchase Option."

67.     Mr. Moskovitz never told Mr. Bernstein that Mr. Horowitz had agreed to the terms contained in the "Property Purchase Option" or that he (Mr. Moskovitz) had in his possession any agreement signed by Mr. Horowitz in which he agreed to sell or donate any of the three Properties to Shaarei Arazim.

68.     Mr. Horowitz never told Mr. Moskovitz that he would sell or donate the three Properties to Shaarei Arazim.

69.     To the contrary, Mr. Horowitz told Mr. Moskovitz that he viewed the three Properties as a commercial real estate investment (different from his involvement with both Adas Torah and Merkaz in Los Angeles), and that he expected Shaarei Arazim to pay rent for all three Properties.

70.     Mr. Bernstein also had Mr. Moskovitz send to Mr. Horowitz a paragraph accompanying the Property Purchase Option which read:

Add the following clause to building sales contract.

The property that is the subject of this agreement has been appraised at over $1,000,000. The property is being sold below market price subject to the stipulation that Shaarei Arazim of Monsey, a New York State non-profit corporation, has an agreement to acquire the building upon satisfaction of its mortgage debt.

71.   Mr. Horowitz did not agree to that language and it is not contained in the purchase agreement or any other transaction document for the Horowitz's purchase of 52 South Main Street.

72.   Separate and apart, the proposed language tendered by Mr. Bernstein through Mr. Moskovitz was not accurate.  The Park Avenue Bank, Mr. Horowitz's lender, appraised the fair market value of 52 South Main Street at $750,000 as of February 2006 (Exhibit G).  Plaintiffs' own expert report in this litigation appraised 52 South Main Street at no more than $800,000 as of February 2006 (when Mr. and Mrs. Horowitz purchased the property from Biomed) (Exhibit III).

73.   On February 1, 2006, Biomed sold the Property at 52 South Main Street to Mr. Horowitz and Alona Horowitz for $750,000.  A copy of the deed and contract of sale are Exhibits D and H.

74.   Biomed's sale of 52 South Main Street occurred after Mr. Horowitz had told Mr. Moskovitz that he would not agree to donate the Properties to Shaarei Arazim, nor sell them to Shaarei Arazim on the terms suggested by Mr. Bernstein.

75.   Mr. Bernstein sold 52 South Main Street to the Horowitzes without any language that would have granted any repurchase right or obligate Mr. and Mrs. Horowitz to transfer any of the three Properties to Shaarei Arazim or anyone else.

76.   Mr. and Mrs. Horowitz personally paid the full purchase price of $750,000 for 52 South Main Street by borrowing the money from The Park Avenue Bank and signing a personal mortgage for that amount.  A copy of the mortgage documents are Exhibits E, I and J.

77.   Shaarei Arazim did not contribute any financing or support whatsoever to Mr. and Mrs. Horowitz's purchase of 52 South Main Street.

78.     Shaarei Arazim did not have the funds to purchase 52 South Main Street and could not get a mortgage to do so.

79.     The 52 South Main Street purchase agreement, mortgage, and all other transaction documents are in the names of Mr. and Mrs. Horowitz as buyer/owner.  They do not contain any provision under which Mr. or Mrs. Horowitz agreed to transfer or donate 52 South Main Street to Shaarei Arazim or anyone else.

80.     As part of the closing for 52 South Main Street, Mr. Bernstein, as president of Shaarei Arazim, signed a written lease (the "2006 Lease") for the Property.  A copy of the 2006 Lease is Exhibit F.

81.     The 2006 Lease identifies Mr. Horowitz as the landlord of the Property and Shaarei Arazim as the tenant.

82.     With respect to all three Properties, Mr. Horowitz gave to Mr. Moskovitz his power of attorney to represent him at the various closings.  Mr. Moskovitz retained Nathan Kahan, a local real estate attorney, to handle the legal work at the closings on behalf of Mr. Horowitz.  Mr. Horowitz did not get involved in the details of the closings on any of the Properties and did not attend the closings; he left all of that to Mr. Moskovitz.

83.     The result of all of the foregoing real estate activities is that Shaarei Arazim, a school run by Mr. Horowitz's good friend Mr. Moskovitz, was able to use the Properties to operate the school.

84.     Mr. Horowitz acted for the benefit of Shaarei Arazim, his friend Mr. Moskovitz, and himself.

85.     Mr. Horowitz did tell Mr. Moskovitz that at some point in the future, he might consider selling the Properties to Shaarei Arazim, but only if all of Mr. Horowitz's loans to

Shaarei Arazim were repaid in full, Shaarei Arazim had fully performed all of its obligations as a tenant of the three Properties, and the entire transaction was "hassle free."

86.     Mr. Horowitz expected that Shaarei Arazim would commence a capital campaign amongst its donors and that it would be in position to purchase all three Properties from him. That did not occur.

87.     Mr. Moskovitz and Mr. Horowitz never reached any understanding about the future of the Properties.

88.     Mr. Horowitz had no conversations with Mr. Bernstein regarding the Properties until 2008, other than their one five-minute conversation in Mr. Bernstein's home in December 2005, well before Mr. Bernstein sold 52 South Main Street to Mr. and Mrs. Horowitz.

**Mr. Bernstein Consented to a Holdback and to Release of Funds to Mr. Horowitz**

89.     At the time that Mr. and Mrs. Horowitz purchased 52 South Main, The Park Avenue Bank held back $187,500 as "collateral for equity paydown."

90.     Mr. Bernstein, on behalf of Biomed, consented to the holdback by The Park Avenue Bank of $ 187,500.

91.      In October 2008, the $187,500 held back by The Park Avenue Bank, plus interest, was released to Horowitz. The amount that The Park Avenue Bank released to Mr. Horowitz was $208,631.50.

92.     When The Park Avenue Bank released the money to Mr. Horowitz, Mr. Bernstein agreed that Mr. Horowitz could hold the money.

**Mr. Moskovitz Managed the Three Properties Until 2012**

93.     Mr. Horowitz's practice was to arrange with a member of the local community to manage his properties.  In this case, he chose his friend Mr. Moskovitz to manage the Properties in Spring Valley.

14

94.     Mr. Horowitz authorized Mr. Moskovitz to set up bank accounts in New York to deposit rent payments and pay bills for the Properties.

95.     Due to their friendship and Mr. Horowitz's desire to support Mr. Moskovitz in his role as executive director of Shaarei Arazim, the business relationship between Mr. Horowitz and Shaarei Arazim was casual.

96.     Mr. Horowitz did not set the amount of rent that would be paid by Shaarei Arazim or the other tenants of the Properties, but rather, he left it to Mr. Moskovitz to charge sufficient rent to cover the mortgages, insurance premiums and taxes on the Properties and generate a cash flow.  For example, there were times when Shaarei Arazim did not have the funds to pay rent. Mr. Moskovitz would usually tell Mr. Horowitz when this occurred, and Mr. Horowitz would forego the rent that month on the expectation that it would be paid when Shaarei Arazim had available funds.

97.     While Mr. Moskovitz worked for Shaarei Arazim, he kept the books and records for the Properties in Shaarei Arazim's offices.  After Mr. Moskovitz separated from Shaarei Arazim, he continued for a while to manage the Properties for Mr. Horowitz.

98.     Mr. Moskovitz stopped managing the Properties in 2012.

**Mr. Horowitz Pays the Mortgage, Taxes and Insurance Premiums for the Properties**

99.     In 2004, after purchasing 56 South Main Street, Mr. Horowitz formed an "S" corporation called "56 South Main Street Corporation" to receive the rent checks from the building's tenants and to pay the mortgage, insurance premiums and taxes on 56 South Main Street.  A copy of the K-1 from 56 South Main Street Corporation is Exhibit QQ.

100.    56 South Main Street Corporation was subsequently dissolved and Mr. Horowitz began to do business in the name of "Spring Valley Cedars."  A copy of the business certificate is Exhibit K.

101.    At the time that Mr. Horowitz purchased 56 South Main Street, there were other tenants leasing space in the building.

102.    Those tenants, as well as Shaarei Arazim, paid rent to 56 South Main Street Corporation, and later to Spring Valley Cedars.  A copy of rent checks from the tenants and their lease agreements are Exhibits EE through OO.

103.    From 2005 thru the beginning of 2012, Mr. Moskovitz collected the rents from Shaarei Arazim and the other tenants of all three Properties.

104.    Mr. Moskovitz used Mr. Horowitz's various bank accounts for 56 South Main Street Corporation and Spring Valley Cedars to pay the mortgage and other payments due on 56 South Main Street. As such, Mr. Horowitz, through either 56 South Main Street Corporation or Spring Valley Cedars, has been paying the mortgage, insurance premiums and property taxes due on 56 South Main Street.

105.    After purchasing 1 East Funston, Mr. Horowitz continued to lease 1 East Funston to the existing tenants and, when they left, he leased 1 East Funston to Shaarei Arazim.

106.    During that time, Mr. Moskovitz used Spring Valley Cedars' bank account to pay the mortgage, insurance premiums, property taxes and other payments due on 1 East Funston.

107.    As such, Mr. Horowitz, personally or through Spring Valley Cedars, has been paying the mortgage, insurance premiums and property taxes due on 1 East Funston.

108.    After purchasing the Property at 52 South Main Street, Mr. Horowitz leased it to Shaarei Arazim.

109.    Mr. Horowitz pays the mortgage and property taxes due on 52 South Main Street.

110.    From the closing until early 2012, Shaarei Arazim paid the rent on 52 South Main Street by wire transfer directly to Mr. Horowitz's bank account at Park Avenue Bank, and Park

Avenue Bank deducted the mortgage and other payments due on 52 South Main Street.  Most

recently, Shaarei Arazim pays the rent by wire transfer directly to Mr. Horowitz's bank account

in California, and he wires the mortgage and other payments due on 52 South Main Street to

Park Avenue Bank.

111.    There were months when Shaarei Arazim did not pay the rent due on the

Properties but of course Mr. Horowitz was still obligated to pay the mortgages, which are in his

name, and the property tax bills, which are addressed to Mr. Horowitz as owner of the Properties.

**Shaarei Arazim Signed 2008 Leases for the Properties**

112.    In late 2007 or early 2008, Mr. Moskovitz separated from Shaarei Arazim.  Once

Mr. Moskovitz left Shaarei Arazim, Mr. Horowitz no longer had any tie to Shaarei Arazim.

Nevertheless, he was willing to continue to lease the Properties to Shaarei Arazim because it was

a good real estate investment.

113.    In early 2008, Mr. Horowitz contacted Mr. Bernstein, as president of Shaarei

Arazim, and asked for new, formal leases with Shaarei Arazim to regularize his business

dealings with Shaarei Arazim because his friend Mr. Moskovitz was no longer employed there.

114.    On or about August 1, 2008, David Bernstein on behalf of Shaarei Arazim as

tenant signed a lease for each of the Properties (the "2008 Leases").  Mr. Horowitz signed the

2008 Leases as landlord.  A copy of the 2008 Leases are at Exhibits L, M and N.

115.    The 2008 Leases identify Shaarei Arazim as the tenant and Mr. Horowitz as the

landlord of the Properties.

116.    The 2008 Leases are for a 5-year term, which expired on July 31, 2013, and are

renewable at the parties' collective option for another 5-year term.  Mr. Horowitz elected not to

extend the term of the 2008 Leases, and therefore all three 2008 Leases terminated as of July 31,

2013.  After that date, Shaarei Arazim was obligated to vacate all three Properties, and because it

failed to do so, Shaarei Arazim must pay holdover rent equal to 200% of the then-current rent. As of this date, Shaarei Arazim has failed to pay the full rent due, and Mr. Horowitz has commenced an action in landlord tenant court to both evict Shaarei Arazim and recover unpaid rent.

117.    The 2008 Leases are "triple net" leases.  That means that Shaarei Arazim as the tenant is responsible for paying all the expenses of maintaining the Properties, such as electric bills and snow removal.

118.    The 2008 Leases also require Shaarei Arazim to obtain and maintain insurance on the Properties and name Mr. Horowitz as an additional insured.

119.    In addition, the 2008 Lease for 52 South Main Street obligates Shaarei Arazim to complete certain improvements to 52 South Main Street and obtain a Certificate of Occupancy from the City of Spring Valley.  This work has still not been completed, and Shaarei Arazim occupies 52 South Main Street without the benefit of a Certificate of Occupancy. Mr. Horowitz has made repeated demand on Shaarei Arazim to perform its obligation under the Lease regarding the improvements, and notwithstanding such demands, Shaarei Arazim has failed to do so.

120.    The 2008 Leases require Shaarei Arazim to pay to Mr. Horowitz annual rent of $180,000 for 52 South Main Street, $32,400 for 1 East Funston and $18,000 for 56 South Main Street.   The rent for 56 South Main Street is less than the other properties to reflect the fact that Shaarei Arazim is only leasing a portion of 56 South Main Street.  As other tenants vacate, the rent on 56 South Main Street will increase under the terms of the 2008 Lease.

121.    The total amount of the rents that the tenants pay on the Properties each month covers the mortgage payments, insurance premiums and property tax payments due each month

on the Properties, plus a slight return to Mr. Horowitz. His chief economic benefit is that the rent payments pay down the mortgages.  Assuming that the Properties maintain their value, each month Mr. Horowitz's equity in the three Properties increases by the amount of the paydown of the mortgages.

122.     Because the rents being paid by Shaarei Arazim and the other tenants were sufficient to cover the mortgage, real property taxes and insurance, Mr. Horowitz was carrying the Properties without additional investment, with the hope of appreciation.

123.     Once the mortgages are all paid in full, the rents, less property taxes and insurance, would be paid to Mr. and Mrs. Horowitz as a return on their investment.

124.     Although written leases were in place, Shaarei Arazim stopped paying rent for a time in 2010.  Mr. Horowitz brought an action against it in landlord-tenant court in Rockland County. The action settled, but Shaarei Arazim still owes over $61,000 to Mr. Horowitz under the terms of the 2008 Leases.

**Mr. Horowitz Did Not Agree to Donate the Properties to Shaarei Arazim**

125.     While Mr. Moskovitz was Executive Director of Shaarei Arazim, one of his functions was fundraising.  Shaarei Arazim urgently needed money to pay salaries and bills.

126.     In his capacity as Shaarei Arazim's Executive Director, and under pressure to raise money for the school, Mr. Moskovitz was not careful about what he told or wrote to potential donors about ownership of the Properties.

127.     At the time that Mr. Moskovitz was fundraising for Shaarei Arazim, he hoped that he would be able to convince his friend Mr. Horowitz to transfer ownership of the Properties to Shaarei Arazim.

128.    Mr. Moskovitz believed that Mr. Horowitz would agree to help Shaarei Arazim because of his philanthropy and support of religious institutions and because of their long term friendship.

129.    During the discovery in this action, Mr. Horowitz learned for the first time that Mr. Moskovitz made statements and signed letters indicating that Mr. Horowitz would transfer or donate the Properties to Shaarei Arazim.

130.    Mr. Horowitz never told Mr. Moskovitz that he would transfer or donate the Properties to Shaarei Arazim.

131.    Mr. Horowitz never authorized Mr. Moskovitz to make any such statements or write such letters, and did not even know that Mr. Moskovitz had made such statements or written such letters until the discovery process in this action.

132.    Mr. Moskovitz never asked Mr. Horowitz to donate, sell or transfer ownership of any of the Properties to Shaarei Arazim, either before or after he made those statements and wrote those letters.

133.    Mr. Horowitz never told Mr. Moskovitz that he would donate, sell or transfer ownership of any of the Properties to Shaarei Arazim or anyone else.

134.    Mr. Horowitz never authorized Mr. Moskovitz to say or write that he would donate, sell or transfer ownership of any of the Properties to Shaarei Arazim or anyone else.

### Mr. Horowitz Loaned Money to Shaarei Arazim

135.    Over the course of several years, Mr. Horowitz loaned significant amounts of money to Shaarei Arazim.

136.    Because of his close friendship with Mr. Moskovitz, not all of Mr. Horowitz's loans to Shaarei Arazim were memorialized with promissory notes or loan documents.

137.    In June 2004 and August 2005, Shaarei Arazim sent to Mr. Horowitz three checks in partial repayment of loans that Mr. Horowitz had made to the school. Mr. Moskovitz, who was Executive Director of the school at the time, signed the checks.

138.    Mr. Horowitz objected to the notations on the checks, but Mr. Moskovitz did not reissue the checks.  In fact, the checks were partial repayments of Mr. Horowitz' loans to Shaarei Arazim and were not related to the Properties.  Mr. Horowitz believes that these loans have been repaid, and is making no demand for payment in this action.

139.    In 2006, and again in 2007, Mr. Horowitz made a total of four additional loans to Shaarei Arazim totaling $285,000, as follows:

a.   On or about December 2006, Mr. Horowitz loaned $20,000 to Shaarei Arazim. The loan was due May 1, 2007. Shaarei Arazim owes interest at the rate of 8.25% per year for any amount not paid by May 1, 2007.

b.   On or about December 19, 2006, Mr. Horowitz loaned $130,000 to Shaarei Arazim.  The loan was due on December 31, 2007.  Shaarei Arazim owes interest at the rate of 50 basis points under the Morgan Stanley lending rate, for any amount not paid by December 31, 2007.

c.   On or about April 12, 2007, Mr. Horowitz loaned $100,000 to Shaarei Arazim. The loan was due on July 1, 2007.   Shaarei Arazim owes interest at the rate of 8.25% per year for any amounts not paid by July 1, 2007.

d.   On or about April 19, 2007, Mr. Horowitz loaned $35,000 to Shaarei Arazim. The loan was due on July 1, 2007.  Shaarei Arazim owes interest at the rate of 8.25% per year for any amounts not paid by July 1, 2007.

140.   At the time of each of these loans, Mr. Moskovitz on behalf of Shaarei Arazim and Mr. Horowitz documented those loans with promissory notes called, in Jewish law, "iskas." A copy of the iskas is Exhibit BBB.

141.   A copy of Mr. Horowitz's checks to Shaarei Arazim reflecting those loan amounts is Exhibit DDD.

142.   Mr. Horowitz required interest on these loans to Shaarei Arazim because he had borrowed from his stock margin account to lend the money to Shaarei Arazim, and the interest rate that he charged Shaarei Arazim matched the interest rate that he paid.

143.   Shaarei Arazim has not repaid the principal amount of those loans and has made only four interest payments totaling $19,600.  As of today, Shaarei Arazim owes to Mr. Horowitz the principal amount of $285,000 plus interest that accrues at $64.42 per day.[1]

### Shaarei Arazim Owes Rent to Mr. Horowitz

144.   Under the 2008 Leases, Shaarei Arazim is required to pay the rent of any tenant who vacates the Properties.

145.   Shaarei Arazim has failed to pay such rent due to Mr. Horowitz, in the amount of $61,448 (Exhibit KKK is a copy of the three-day demand that Mr. Horowitz sent to Shaarei Arazim in February 2013 demanding the amount due).

---

[1] The Court accepts Mr. Horowitz's use of the rate of 8.25% annual interest for the first loan because the Morgan Stanley lending rate fluctuates daily and would be difficult to calculate for five and a half years, and because the result would be approximately 8.25% in any event.

**CONCLUSIONS OF LAW**

**I.**

**PLAINITFFS HAVE NO CLAIM FOR A CONSTRUCTIVE TRUST BECAUSE THE TRANSACTIONS ARE GOVERNED BY VALID WRITTEN CONTRACTS**

1.      Plaintiffs' claim for a constructive trust fails because the subject matter of this lawsuit, the fate of the Properties, is governed by a total of 6 written, enforceable contracts. See In re First Cent. Fin. Corp., 377 F.3d 209, 213 (2d Cir. 2004) (existence of written agreement bars constructive trust claim); Rosenblatt v. Christie, 195 F. App'x 11, 13 (2d Cir. 2006) (same); Petrello v. White, 412 F. Supp. 2d 215 (E.D.N.Y. 2006), aff'd on other grounds, 344 F. App'x 651 (2d Cir. 2009) (constructive trust fails where written contract "explicitly contemplates the fate of the land at issue"); Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 514 (S.D.N.Y. 2012) (existence of written contract precludes finding of constructive trust).

2.      In Petrello, the seller, like Plaintiffs in this case, asserted that the parties had a secret oral agreement that the buyer would convey the land back to him, which was excluded from the written contract. 412 F. Supp. 2d at 231-32. The court held that the purported oral agreement ran "directly counter to the express terms of the written agreement," and that the existence of the written agreement barred a finding of unjust enrichment, and by extension, a constructive trust. Id. at 233.

3.      Similarly, in Staten Island University Hospital v. Sarkis, 12 Misc. 3d 1180(A), 2006 WL 1892256, at *1 (Sup. Ct. Richmond Cnty. May 10, 2006), the plaintiff claimed that the defendant landlord, with whom it had a written lease agreement, orally agreed to donate the building at the end of the eight-year lease period. The court granted summary judgment for defendant, landlord, finding that because the written lease, which contained a merger clause,

23

contained no language "even remotely obligating [defendant] to donate premises to [plaintiff],"
there was no "donative provision for the Court to enforce." Id at *3. "The mere assertion by one
party to a contract that [the] language means something to it when it is otherwise clear and
unequivocal when read in context in insufficient, standing alone, to raise a triable issue of fact."
Id.

4.      Here, there are written contracts of sale for each of the Properties.  The sale of 52
South Main is governed by a contract between Mr. and Mrs. Horowitz and Biomed.  The sales of
1 East Funston and 56 South Main are governed by contracts of sale between Mr. Horowitz and
third parties with no connection to this litigation. All three contracts expressly state that Mr.
Horowitz is the buyer.

5.      Further, Shaarei Arazim's relationship to the Properties, as tenant, is governed by
three lease agreements, one for each Property. Each lease provides that Mr. Horowitz is the
property owner and that Shaarei Arazim is the current tenant (through July 2013). None of these
six written agreements includes any promise or intent to donate or sell the Properties to Shaarei
Arazim.

6.      The Purchase Agreements and the three leases are all governed by merger clauses.

7.      Thus, since the contracts explicitly discuss the "fate of the land at issue,"
Plaintiffs cannot prevail on a constructive trust claim. See Petrello, 412 F. Supp. 2d at 231-33.

## II.

### PLAINTIFFS ARE NOT ENTITLED TO A CONSTRUCTIVE TRUST

8.      Plaintiffs have not demonstrated, by clear and convincing evidence, the four
elements necessary for imposition of a constructive trust.  See Martha Graham Sch. & Dance

Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 646 (2d Cir. 2004).

9.      The Second Circuit has repeatedly held that "New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." In Re Ades & Berg Grp. Investors, 550 F.3d 240, 245 (2d Cir. 2008); Rosenblatt, 195 F. App'x at 13; In re First Cent. Fin. Corp., 377 F.3d at 212; see also Consumers Union of U.S., Inc. v. State, 5 N.Y.3d 327, 348, n.14 (2005) (constructive trust "is only imposed upon a finding of these four elements).

10.      Without these four elements, there can be no constructive trust: "[t]he most that can be said is that the defendants made a promise which the law does not compel them to keep, and that afterwards they failed to keep it." Bontecou v. Goldman, 103 A.D.2d 732, 733 (2d Dep't 1984) (citing Bums v. McCormick, 233 N.Y. 230, 232 (1922); internal punctuation omitted) (oral agreement to transfer property does not give rise to constructive trust)).

11.      In other words, "a constructive trust is a 'fraud-rectifying' remedy rather than an 'intent-enforcing' one" so that while a plaintiff's unrealized expectations may give rise to a moral obligation on defendant's part to transfer property, they do not, without more, permit the court to fashion a constructive trust. In re First Cent. Fin. Corp., 377 F.3d at 216.

**A.  Plaintiffs Had No Confidential or Fiduciary Relationship With Mr. Horowitz**

12.      There was no fiduciary relationship between Plaintiffs and Mr. Horowitz because Mr. Horowitz was under no duty "to act for or to give advice for the benefit of another upon matters within the scope of the relation." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19-20 (2005).

13.     The relationship between Mr. Horowitz and Plaintiffs was limited to arms-length transactions, which do not give rise to fiduciary relationships. Id.; see also Rosenblatt, 195 F. App'x at 13 (no fiduciary relationship between jewelry dealer and auction house); Faulkner, 602 F. Supp. 2d at 473 (musical group and record company); LFD Operating, Inc. v. Ames Dep't Stores, Inc., No. 02 Civ. 6271, 2004 WL 1948754, at *5 (S.D.N.Y. Sept. 1, 2004) (debtor-creditor relationship could not support constructive trust claim); Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 512 (S.D.N.Y. 1994) (close contact during contract negotiations, including knowledge of other party's poor finances, does not create fiduciary relationship).

14.     The relationship between Mr. Horowitz and Shaarei Arazim was merely that of lender-borrower and of landlord-tenant.  Such relationships do not give rise to fiduciary duties. See Infanti v. Scharpf, No. 06 Civ. 6552, 2012 WL 51 1568, at *7 (E.D.N.Y. Feb. 15. 2012) (citing Dembick v. 220 Central Park S., LLC, 33 A.D.3d 491, 492 (1st Dep't 2006)); Clifford v. Hughson, 992 F. Supp. 661, 670 (S.D.N.Y. 1998).

15.     As a lender to Shaarei Arazim, Mr. Horowitz is not a fiduciary.  "It is a clear principle under New York law that a lender is not the fiduciary of a debtor. See BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003)." Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 27 (S.D.N.Y. 2009) aff'd sub nom. Musalli Factory for Gold & Jewellry Co. v. JPMorgan Chase Bank, N.A., 382 F. App'x 107 (2d Cir. 2010); In re Agape Litig., 773 F. Supp. 2d 298, 320 (E.D.N.Y. 2011) (emphasis added); Citibank, N.A. v. Silverman, 85 A.D.3d 463, 466, 925 N.Y.S.2d 442, 445 (2011).

16.     At no time was Horowitz "under a duty to act for or to give advice for" Shaarei Arazim's benefit. See EBC I. Inc., 5 N.Y.3d at 19-20.

**B.    Mr. Horowitz Did Not Promise to Either Sell at Cost or Donate the Properties to Shaarei Arazim**

17.    Mr. Horowitz made no promise to either sell at cost, or donate, the Properties to Shaarei Arazim.

18.    Mr. Horowitz did not sign any written agreement stating such alleged promise to either sell at cost, or donate, the Properties to Shaarei Arazim.

19.    The deeds, contracts and other closing documents for Mr. Horowitz's purchase of the Properties do not include any such promise.

20.    The leases signed by Mr. Horowitz (as landlord) and Shaarei Arazim (as tenant) do not include any such promise.

21.    Mr. Horowitz never made such a promise to Mr. Moskovitz or anyone else.

22.    Mr. Moskovitz's statements, which gave others the impression that Mr. Horowitz had promised to donate the Properties to Shaarei Arazim, are not binding on Mr. Horowitz.  Mr. Horowitz did not authorize Mr. Moskovitz to make such statements and did not even know that Mr. Moskovitz was making such statements. See In re Refco Sec. Litig., 779 F. Supp. 2d 372, 375 (S.D.N. Y. 2011) (a principal is not bound if his agent acts ultra vires); Bank of New York v. Alderazi, 28 Misc. 3d 376, 378-379 (Sup. Ct. Kings Cnty. 2010) (agent constituted for particular purpose, cannot bind his principal by an act beyond his authority).

23.    Plaintiffs thus have not met their burden of proving a promise, which is the second element of a claim for constructive trust.  See, e.g., In Re Ades & Berg Grp. Investors, 550 F.3d at 245.

**C.    Plaintiffs Did Not Reasonably Rely on Any Alleged Promise**

24.    Plaintiffs did not reasonably rely on any alleged promise by Mr. Horowitz. See Amusement Indus., Inc. v. Stem, 786 F. Supp. 2d 758, 785 (S.D.N.Y. 2011).

25.    As discussed above, Mr. Horowitz never made any promise to either sell at cost, or donate, the Properties to Shaarei Arazim.

26.    In any event, Shaarei Arazim never owned the Properties and could not have transferred them to Mr. Horowitz. See Amusement Indus., 786 F. Supp. 2d at 785; Kaufman v. Torkan, 51 A.D.3d 977, 980 (2d Dep't 2008) (no constructive trust in favor of "potential buyer" of property, because he had no interest in property); accord, Kastrat v. Wynnykiw, 13 A.D.2d 283, 283 (1st Dep't 2004) (property interest is necessary element for constructive trust).

27.    Biomed never owned 56 South Main Street or 1 East Funston Avenue and could not have transferred them to Mr. Horowitz.  See Amusement Indus., 786 F. Supp. 2d at 785.

28.    Biomed owned 52 South Main Street and transferred it to Mr. Horowitz, but it was unreasonable for Biomed to have relied on any alleged promise by Mr. Horowitz in light of the fact that Mr. Horowitz rejected Mr. Bernstein's efforts to include in the written transaction documents for the sale of 52 South Main Street an agreement by Mr. Horowitz to sell or donate the Properties to Shaarei Arazim.  See Petrello, 344 F. App'x at 653 (buyer's reliance on seller's oral representations held unreasonable where provision did not appear in final contract); Steinbeck v. Steinbeck Heritage Found., 400 F. App'x 572, 577 (2d Cir. 2010) ("party cannot reasonably rely on promise that conflicts with written agreement's express terms"); B. Lewis Prods., Inc. v. Angelou, No. 06 Civ. 6390, 2008 WL 1826486, at *5 (S.D.N.Y. Apr. 22, 2008) (plaintiff could not claim that it reasonably relied on oral representations made during negotiation of written agreement that ultimately contained different provision); Bernstein v. Golden Press Holding, L.L.C., 293 A.D.2d 414, 414-415 (1st Dep't 2002) (omission of terms from written agreement negates any inference of reasonable reliance on alleged misrepresentations made during negotiations).

29.     Mr. Horowitz refused to sign Mr. Bernstein's proposed "Property Purchase Option."

30.     Mr. Moskovitz never told Mr. Bernstein that Mr. Horowitz had agreed to the terms contained in the "Property Purchase Option" or that he had in his possession any agreement signed by Mr. Horowitz in which he agreed to sell or donate any of the three Properties to Shaarei Arazim.

31.     Mr. Horowitz also rejected a paragraph sent by Mr. Bernstein along with the Property Purchase Option which read:

Add the following clause to building sales contract.

The property that is the subject of this agreement has been appraised at over $1,000,000.  The property is being sold below market price subject to the stipulation that Shaarei Arazim of Monsey, a New York State non-profit corporation, has an agreement to acquire the building upon satisfaction of its mortgage debt.

32.      Mr. Horowitz did not agree to that language and it is not contained in the purchase agreement or any other transaction document for Mr. and Mrs. Horowitz's purchase of 52 South Main Street.

33.     The transaction documents for the Properties do not include any language that would require Mr. and Mrs. Horowitz to sell or donate any of the Properties to Shaarei Arazim or to anyone else.  Notwithstanding all of the foregoing, Mr. Bernstein nevertheless sold 52 South Main St. to Mr. Horowitz.  It is and was unreasonable for a sophisticated investor such as Mr. Bernstein to assume that there was an agreement obligating Mr. Horowitz to sell or donate the Properties to Shaarei Arazim which was not otherwise included in the purchase documents and not otherwise provided in writing to Mr. Bernstein or Shaarei Arazim prior to the purchase and sale of 52 South Main St.

34.     Further, Biomed lacks standing to assert a constructive trust claim for the benefit

of Shaarei Arazim.  See In re 1031 Tax Grp., LLC, 439 B.R. 47, 61-62 (Bankr. S.D.N.Y. 2010)

(collecting cases); Melnick v. Press, 809 F. Supp. 2d 43, 68, n.23 (E.D.N.Y. 2011) (son lacks

standing to seek constructive trust for benefit of mother); Aliano, Aliano & Aliano v. Aliano, 251

A.D.2d 436, 437 (2d Dep't 1998) (plaintiffs had no standing to sue for constructive trust on

behalf of nieces; plaintiffs were not injured in fact nor were they beneficiaries of defendant's

promise).

35.     Plaintiffs also cannot claim that they relied on any alleged promise by Mr.

Horowitz because Shaarei Arazim began the process of seeking a zoning change and site

approval for 52 South Main Street, and retained architects and engineers to develop plans for

converting 52 South Main Street into a school building, in 2003, well before Mr. Horowitz

agreed to purchase 52 South Main Street.

36.     Indeed, Shaarei Arazim began the zoning process for 52 South Main Street while

Mr. Bernstein owned that Property.

37.     In July 2004, Mr. Bernstein filed a petition with the Village of Spring Valley

seeking a zoning change for 52 South Main Street.  Mr. Horowitz joined the petition as owner of

56 South Main Street to inform the Village that he would give the school access to 56 South

Main Street for buses and parking.

38.     Mr. Horowitz did not agree to purchase 52 South Main Street until over a year

after the petition, in late 2005.

39.     Further, Shaarei Arazim could not have used the Properties for its school unless it

obtained a zoning change and site approval for 52 South Main Street and converted that Property

into a school building.

40.     Shaarei Arazim's improvements to 52 South Main Street and the other Properties as a tenant were thus for Shaarei Arazim's own benefit – to meet zoning and other legal requirements for operating a school on the premises, as well as for its practical needs for classrooms, office space, bus lanes and other facilities for its students. Shaarei Arazim would have been required to make those expenditures to operate a school on the premises, whether it leased or bought the Properties.

41.     Such expenditures by Shaarei Arazim for its own needs do not give rise to a constructive trust. See Marini, 79 A.D.3d at 933-34 (installation of swimming pool, new tile, and interior painting improved plaintiff tenants' home); Lefton, 160 A.D.2d at 703-04 (improvements attributed to plaintiff wanting better home for self and family); see also Lebowitz v. Mingus, 100 A.D.2d 816, 817 (1st Dep't 1984) (tenant's renovations and improvements not evidence of oral option to purchase, but only of her desire to improve surroundings in which she was to live and work).

42.     Finally, the checks paid by Shaarei Arazim to Mr. Horowitz during the same time that he was purchasing the Properties were not repayments of Mr. Horowitz's down payments for the Properties.  Rather, they were repayments of loans that Mr. Horowitz had made to Shaarei Arazim.  Therefore, they do not show any reliance by Shaarei Arazim on any alleged promise by Mr. Horowitz.

**D.     Mr. Horowitz Will Not be Unjustly Enriched by Retaining his Properties**

43.     A written agreement between the parties precludes a finding of unjust enrichment and, as a matter of law, precludes the imposition of a constructive trust. In re First Cent. Fin. Corp., 377 F.3d at 213; Petrello, 412 F. Supp. 2d at 233 (collecting cases). Where, as here, plaintiff claims that there was "a secret agreement [that] runs directly counter to the express

terms of the written agreement," the written agreement bars the constructive trust claim. Petrello, 412 F. Supp. 2d at 233.

44.     Here, there are written instruments transferring the Properties to Horowitz, which do not include any promise to convey any of the Properties to Shaarei Arazim.

45.     Similarly, there are written leases between Horowitz and Shaarei Arazim for each of the Properties, none of which contains a promise to convey, and each of which contains a merger clause. Therefore, there can be no unjust enrichment.

46.     Further, Plaintiffs have not shown, as they must, that Horowitz will obtain a "benefit without adequately compensating [Plaintiffs] therefor." See Marini, 79 A.D.2d at 934; see also McGrath v. Hilding, 41 N.Y.2d 625, 629 (1977) ("[enrichment alone will not suffice ... the enrichment [must] be unjust"); accord, Petrello, 412 F. Supp. 2d at 232 ("[o]rdinarily one who receives what he is entitled to under a contract may be enriched, but he is not unjustly enriched").

47.     Biomed was adequately compensated for its sale of 52 South Main because Mr. Horowitz paid $750,000, the fair market value for the property. Bice v. Robb, No. 07 Civ. 2214, 2012 WL 762168, at *8 (S.D.N.Y. Mar. 9, 2012) (no unjust enrichment where buyer paid fair market value for property).

48.     Shaarei Arazim (which did not transfer any property) has been adequately compensated for any amounts it has expended improving the Properties and paying rent because Shaarei Arazim has been permitted to use the Properties for its offices, classrooms, parking lots, busing and for other functions of a school. See Marini, 79 A.D.3d at 933-35; Lefton, 160 A.D.2d at 702-03.  See also Broadway Cent. Prop. Inc. v. 682 Tenant Corp., 298 A.D.2d 253, 253-54 (1st Dep't 2002) (landlord not unjustly enriched by tenant's improvements to the property since

tenant and its sublessees were principal beneficiaries thereof); <u>Staten Island Univ. Hosp.</u>, 2006

WL 1892256, at *4 (rejecting tenant's argument that its payment of more than one million dollars

in rent over eight-year lease unjustly enriched landlord); <u>Lebowitz</u>, 100 A.D.2d at 817 (tenant's

investment in renovations and improvements to apartment could be "satisfactorily explained by

her desire to improve the surroundings in which she was to live and work"); <u>Wilson v. La Van</u>,

22 N.Y.2d 131, 134 (1968) (lessee was as likely to make such improvements and purchases as an

owner would, and mortgage and tax payments could be considered as the plaintiffs rent for the

use of the land).

      49.     Mr. Horowitz will not be unjustly enriched by the rental income that he has

received from Shaarei Arazim and the other tenants, because he has been paying the mortgages,

insurance premiums and taxes on the Properties from that rental income.  Like any other landlord,

he can expect to earn rental income to cover the expenses of the properties he owns, and also

retain ownership of the properties including the benefit of any increase in value of the properties.

**III.**

**MR. HOROWITZ IS NOT ESTOPPED FROM ASSERTING DEFENSES TO THE
ALLEGED ORAL AGREEMENTS BY THE DOCTRINE OF PART PERFORMANCE**

      50.     As discussed above, there were no agreements, oral or otherwise, requiring Mr.

Horowitz to transfer the Properties to Shaarei Arazim at cost. In any event, the alleged oral

agreements are barred by the New York Statute of Frauds. N.Y. General Obligations Law § 5-

703.

      51.     Plaintiffs' part performance of the alleged agreement is not sufficient to evade the

Statute of Frauds because Plaintiffs' conduct was "unequivocally referable" to the alleged oral

agreement. <u>Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. 20 Aegis Grp.</u>

<u>PLC</u>, 93 N.Y.2d 229, 235 (1999).

52.     Shaarei Arazim's conduct in paying rent and improving the Properties is not "unequivocally referable" to a purported oral agreement to transfer the Properties. Rather, it is equally consistent with a landlord/tenant relationship and Shaarei Arazim's desire to use the Properties for a school, which it could not do without extensive renovations. Shaarei Arazim's decision to rent from Mr. Horowitz is not unintelligible or extraordinary without reference to the purported promise: Shaarei Arazim could not purchase the Properties because it had neither the money nor the credit to purchase the Properties or obtain the loans, and the only way it could occupy them was to rent from Mr. Horowitz.

53.     Shaarei Arazim's payments to Mr. Horowitz during the period when he was purchasing the Properties are also not "unequivocally referable" to a purported oral agreement to transfer the Properties.  Rather, the payments were repayments of loans that Mr. Horowitz had made to Shaarei Arazim and were not related to his purchase of the Properties.

54.     Biomed did not partially perform any purported agreement; rather, it fully performed the agreement to sell 52 South Main to Mr. Horowitz pursuant to a written contract that contained no mention of a purchase option or a donation. There is no such thing as a defense of "full performance" to the Statute of Frauds. In any event, Biomed's conduct in selling 52 South Main is not unequivocally referable to an alleged agreement to donate 52 South Main or give Shaarei Arazim a purchase option. Rather, it is consistent with a desire to sell 52 South Main for fair market value (and at a profit), which Biomed did.

## IV.

### PLAINTIFFS ARE NOT ENTITLED TO AN INJUNCTION

55.     An "injunction is not a separate cause of action; it is a remedy" to which litigants are entitled only to the extent their other causes of action state viable claims. <u>Chiste v.</u>

34

Hotels,com L.P., 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010); Reuben H. Donnelley Corp. v.

Mark I Mktg. Corp., 893 F. Supp. 285, 293 (S.D.N.Y. 1995).

**V.**

**MR. HOROWITZ IS ENTITLED TO FULL REPAYMENT OF THE LOANS
AND INTEREST UNDER THE ISKA AGREEMENTS**

56.     Mr. Horowitz has provided proof of the valid note and of defendant's failure to

make payment. See MM Ariz. Holdings LLC v. Bonanno, 658 F. Supp. 2d 589, 592-593

(S.D.N.Y. 2009); Export-Import Bank of U.S. v. Agricola Del Mar BCS, 536 F. Supp. 2d 345,

349 (S.D.N.Y. 2008) affd, 334 F. App'x 353 (2d Cir. 2009).

57.     Mr. Horowitz has provided the Court with copies of the four iskas signed by Eli

Moskowitz on behalf of Shaarei Arazim, thereby meeting his burden of proving the existence of

valid notes.

58.     The iskas, on their face, require Shaarei Arazim to pay Horowitz a total of

$285,000 plus interest at the rate of 8.25% per annum. Id.

59.     Shaarei Arazim has paid only $19,600 in interest to Mr. Horowitz under the iskas.

60.     Shaarei Arazim's partial payment of interest under the iskas of $19,600 constitutes

its admission of the validity of the iskas. See Rhinock v. Simms, 226 A.D. 313, 318 (1st Dep't

1929).

61.     David Bernstein admitted that Shaarei Arazim stopped payment on the iskas.

62.     Shaarei Arazim is in default under the iskas.

63.     Horowitz has thus met his burden of proving default on the four iskas. MM Ariz.

Holdings, 658 F. Supp. 2d at 592-593; Export-Import Bank, 536 F. Supp. 2d at 349; AAI

Recoveries, Inc., 13 F. Supp. 2d at 450.

35

64.    Shaarei Arazim has not repaid the principal amount of those loans and has made only four interest payments totaling $19,600.  As of today, Shaarei Arazim owes to Mr. Horowitz the principal amount of $285,000 plus interest that accrues at $64.42 per day.[2]

## VI.

### SHAAREI ARAZIM OWES RENT AND INTEREST TO MR. HOROWITZ

65.    Under the 2008 Leases, Shaarei Arazim is required to pay the rent of any tenant who vacates the Properties.

66.    Shaarei Arazim has failed to pay such rent due to Mr. Horowitz, in the amount of $61,448 (Exhibit KKK is a copy of the three-day demand that Mr. Horowitz sent to Shaarei Arazim in February 2013 demanding the amount due).

67.    Shaarei Arazim owes to Mr. Horowitz the rent due plus interest.

## VII.

### MR. HOROWITZ IS ENTITLED TO DECLARATORY JUDGMENT

68.    The evidence, including the deeds and title, conclusively shows that Horowitz owns the Properties. See Beshara v. Beshara, 51 A.D.3d 837, 838-89 (2d Dep't 2008).

69.    As shown above, the facts and the law do not support any of Plaintiffs' claims to the Properties.

70.    Therefore, Defendants are entitled declaratory judgment in their favor, finding that Defendants are the rightful owners of the Properties.

---

[2] The Court accepts Mr. Horowitz's use of the rate of 8.25% annual interest for the first loan because the Morgan Stanley lending rate fluctuates daily and would be difficult to calculate for five and a half years, and because the result would be approximately 8.25% in any event.

Dated: New York, New York

      October 11, 2013

                                              Respectfully Submitted,

                                              *Fredric S. Newman*

                                              Fredric S. Newman (FN-3174)

                                              Hoguet Newman Regal & Kenney

                                              10 East 40th Street

                                              New York, New York 10016

                                              Phone: 212-689-8808

                                              *Attorneys for Defendants*

                                              *Michael Horowitz and Alona Horowitz*